**The D.L. AULD COMPANY, Plaintiff and Counterclaim Defendant,**

v.

**PARK ELECTROCHEMICAL CORPORATION, Defendant and Counterclaim Plaintiff.**

**No. 81 Civ. 4086.**

United States District Court, E.D. New York.

Aug. 28, 1986.

Porter, Wright, Morris & Arthur, Columbus, Ohio, for plaintiff and counterclaim defendant.

Darby & Darby, New York City, for defendant and counterclaim plaintiff.

GLASSER, District Judge.

This action began in 1981 as a patent infringement suit brought by the D.L. Auld Co. ("Auld") against Park Electrochemical Corp. ("Park Electrochemical") and its subsidiary, Park Nameplate Co., Inc. ("Park Nameplate"). The action is now before the Court on Auld's motion to dismiss Park Electrochemical's counterclaims against it and thereby put an end to this litigation. For the reasons stated below, the motion will be granted.

*Background*

Before turning to the issues presented in this motion, it is useful first to review some of the prior history of the litigation. In 1982, Park Electrochemical moved for dismissal of the complaint against it on the basis of uncontroverted affidavits "indicating that it does not manufacture, sell, or use the allegedly infringing product." *D.L. Auld Co. v. Park Electrochemical Corp.*, 553 F.Supp. 804, 806 (E.D.N.Y.1982). In addition, "Park Electrochemical ... submitted affidavits indicating that although Park Nameplate is a wholly-owned subsidiary, it is operated as a fully independent entity." *Id.* Treating the motion as one for summary judgment, the Court granted it in part and denied it in part. The Court granted the motion insofar as Auld's complaint attempted to impose liability on Park Electrochemical on the theory that Park Nameplate, which did manufacture the allegedly infringing product, "was a 'mere instrumentality' of Park Electrochemical." 553 F.Supp. at 806. Having considered the "various indicia of control" documented by Auld, the Court concluded that:

> the elements identified by [Auld], when considered in the light of the uncontroverted factors of independence established by Park Electrochemical, are insufficient as a matter of law to establish the degree of domination necessary to disregard Park Nameplate's corporate identity.

*Id.* at 807. The Court denied the motion insofar as disputed material issues of fact prevented the Court from resolving the validity of Auld's theory that:

> Park Electrochemical ... played such a major role in business discussions with [Auld] attempting to resolve the patent dispute involved here that it became an actor directly in the transaction, and therefore is jointly liable with Park Nameplate.

*Id.* at 808.

Following the Court's decision, Park Electrochemical filed an answer to Auld's complaint which asserted three counterclaims against it. In the first counterclaim, Park Electrochemical sought a declaratory judgment invalidating several of Auld's patents. The second counterclaim alleged that Auld has engaged in unfair competi-

tion and unfair trade practices by bringing lawsuits on patents which are invalid and have not been infringed. The third counterclaim alleged that Auld's actions constitute attempts to restrain trade and to monopolize in violation of §§ 1 and 2 of the Sherman Act.

While this litigation was progressing, the key patent underlying Auld's lawsuit was being invalidated in another forum. In August 1983, the Court of Appeals for the Federal Circuit upheld a decision of the Eastern District of Tennessee declaring Auld's patent No. 4,100,010 to be invalid. *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144 (Fed.Cir.1983).[1] In the wake of this decision, it was stipulated in December 1983 that all claims by Auld against Park Nameplate and all of Park Nameplate's counterclaims should be dismissed with prejudice. In May 1984, Auld and Park Electrochemical stipulated that Auld's claims would be dismissed and "the sole issue remaining to be tried is defendant's Counterclaim based upon the charge of fraud on the Patent Office during the prosecution of U.S. Patent No. 4,100,010 and the misuse and antitrust assertions arising therefrom."

*The Antitrust Claim*

Park Electrochemical's antitrust claim is founded on two theories. First, its *Walker Process* theory asserts that the patent on which Auld sued was obtained through fraud on the Patent Office. *See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965) ("[T]he enforcement of a patent procured by fraud on the Patent Office may be violative ... of the Sherman Act ..."). Park Electrochemical's second theory is that even absent fraud on the Patent Office, Auld is liable for bringing an infringement action on a patent it knew to be invalid. *See generally Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62

L.Ed.2d 659 (1980). Both of these theories require proof that in bringing this action, Auld was attempting to restrain trade in or to monopolize the relevant market.

Without addressing the merits of either of these two theories, Auld's motion to dismiss rests solely on the argument that Park Electrochemical lacks standing, in the antitrust sense, to assert them. Antitrust standing derives from § 4 of the Clayton Act. 15 U.S.C. § 15. That section provides in pertinent part:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

The Supreme Court has recently reiterated that despite the apparent expansiveness of this language, "the lower Federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983) (*quoting Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891–92 n. 14, 31 L.Ed.2d 184 (1972)).

In the context of this litigation, Auld relies on the traditional limiting principle that:

> a stockholder has no cause of action for the loss of the value of stock caused by injuries sustained by the corporation as a result of violation of the anti-trust laws.

*New Sanitary Towel Supply v. Consolidated Laundries Corp.,* 211 F.Supp. 276, 278 (S.D.N.Y.1962). Citing the uncontested fact that Park Electrochemical does and did not manufacture, sell or use the product that was the subject of the infringement suit, Auld maintains that this principle is a

---

**1.** A motion to set aside this judgment was subsequently denied by both the district court and the court of appeals. *D.L. Auld Co. v. Chroma Graphics Corp.,* 753 F.2d 1029 (Fed.Cir.) *cert. denied,* — U.S. —, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985).

complete bar to Park Electrochemical's counterclaim.

Park Electrochemical's response to this argument is twofold. First, Park Electrochemical argues that application of the stockholder rule set forth above is inappropriate in light of the multi-factored analysis utilized by the Supreme Court in *Associated General Contractors.* *See* 459 U.S. at 537–46, 103 S.Ct. at 908–13. Second, it argues that this is not "the typical shareholder case in which a shareholder is attempting to recover solely for devalued shares." Brief of Park Electrochemical at 13.

■ Assuming for the moment that this is a "typical shareholder case," the Court has no doubt that the stockholder rule should apply to bar Park Electrochemical's counterclaim. While the Supreme Court in *Associated General Contractors* did suggest that "courts should analyze each situation in light of the factors set forth" in the body of the opinion, 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33, it gave no indication that the longstanding rule barring stockholder standing was no longer valid, or that it represented an improper application of those factors. Quite to the contrary, as the Second Circuit has noted recently, the Court cited with favor *Loeb v. Eastman Kodak,* 183 Fed. 704 (3d Cir. 1910), which applied the stockholder rule under a predecessor statute, as an indication of Congress' intent in using the same statutory language in the present version of the statute. *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986) (citing *Associated General Contractors,* 459 U.S. at 533, 103 S.Ct. at 906). *See also Bookout v. Schine Chain Theatres, Inc.,* 253 F.2d 292, 294 (2d Cir.1958) (L. Hand) (noting that the existence of the stockholder rule "before the passage of the Clayton Act in 1914 ... is a circumstance of importance in interpreting the Clayton Act itself").

Moreover, applying the factors listed in *Associated General Contractors* would also yield the result that Park Electrochemical, insofar as it sues as a stockholder of

Park Nameplate, lacks standing to maintain this counterclaim. First, like the union in that case, Park Electrochemical "was neither a consumer nor a competitor in the market in which trade was restrained." 459 U.S. at 539, 103 S.Ct. at 909 (footnote omitted). Second, the principal injury alleged by Park Electrochemical, the decreased value of its holdings in Park Nameplate, is "only an indirect result" of the antitrust violation alleged. *Id.* at 541, 103 S.Ct. at 910. Finally, there is a more direct victim of the alleged violations, namely Park Nameplate, whose "existence ... diminishes the justification for allowing a more remote party ..." to maintain an action. *Id.* at 542, 103 S.Ct. at 910–11. *See also Meyer Goldberg, Inc. of Lorain v. Goldberg,* 717 F.2d 290, 294 (6th Cir.1983) (applying factors to deny stockholder standing).

Park Electrochemical's next argument, that this is not "the typical shareholder case," warrants two responses. As an initial matter, this disclaimer is belied by the assertion in the very next paragraph of its brief that it "expects to provide the traditional expert testimony concerning the price Park [Electrochemical] should have realized for the sale of [Park Nameplate] compared to the book value price obtained because of this litigation." *Id.* at 14. Surely this is precisely the type of derivative claim that the shareholder rule was intended to bar.

■ Second, the cases cited by Park Electrochemical to distinguish this case from "the typical shareholder case" and to bring it in line with the factors considered in *Associated General Contractors* are simply inapposite. The court in *John Peterson Motors, Inc. v. General Motors Corp.,* 613 F.Supp. 887, 902 (D.Minn.1985), for example, which allowed shareholder standing, held that "where there is such a unity of interest and ownership that [the corporation] might be properly pierced, the court finds that the usual rule concerning the standing of ... shareholders ... does not apply." The court specifically noted that "[s]ituations such as the present one,

where the sole shareholder and president may so dominate the corporation as to be its alter-ego, are rare and will not subvert the general rules against shareholder standing." *Id.* at 902 n. 18. As the Court concluded on the summary judgment motion, *see* p. 583 *supra,* this situation is not present here.[2]

For similar reasons, Park Electrochemical's reliance on *Kolb v. Chrysler Corporation,* 357 F.Supp. 504 (E.D.Wis.1973) is also misplaced. In *Kolb,* the plaintiff, the franchisee of an automobile dealership, was allowed standing to sue for injuries to the franchise. The Court based its holding on the symbiotic relationship between the individual and the business, finding that because plaintiff was the manager of the dealership, "his reputation, as well as his livelihood, was bound up with the success of his franchise." *Id.* at 506–07. Again, given "the factors of independence established by Park Electrochemical" on the motion for summary judgment, 553 F.Supp. at 807, Park Electrochemical's "position in this case," unlike the plaintiff in *Kolb,* "is [not] sufficiently different from that of an ordinary stockholder in a corporation for [it] to maintain this action."

■ Nor is this a case in which the forcing out of business of the target of an alleged conspiracy resulted in the demise of its parent corporation. *See Pacific Seafarers, Inc. v. Pacific Far East Line,* 48 F.R.D. 347, 350–51 (D.C.D.C.1969). Even assuming some financial interdependence between Park Electrochemical and Park Nameplate, Park Electrochemical's allegations do not bring it within the fact pattern of *Pacific Seafarers.*

Another case relied on by Park Electrochemical, *Perkins v. Standard Oil Co.,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), is not a standing case at all. In that case,

Perkins submitted some evidence tending to show that he as an individual had suffered financial losses because the two failing Perkins corporations (Perkins of Washington and Perkins of Oregon) were unable to pay him agreed brokerage fees . . .

395 U.S. at 649, 89 S.Ct. at 1875. Park Electrochemical argues that because the Supreme Court allowed these losses to be recovered, it should be allowed to recover management fees paid to it by Park Nameplate which it claims were diminished because of Auld's actions. However, there is nothing in *Perkins* to suggest that these losses alone are sufficient to support antitrust standing. An examination of the Supreme Court's reasoning, as well as the decision of the Court of Appeals below, *Standard Oil Co. v. Perkins,* 396 F.2d 809 (9th Cir.1968), which allowed Perkins to recover some types of damages, but not others, 396 F.2d at 815, makes clear that the issue was not Perkins' standing, but rather, given his standing, the proper extent of his recovery:

Perkins . . . was the principal victim of the price discrimination practiced by Standard. Since he was directly injured and was clearly entitled to bring this suit, he was entitled to present evidence of *all* of his losses to the jury.

395 U.S. at 649–50, 89 S.Ct. at 1875 (emphasis added). *See* Areeda & Turner, *Antitrust Law* § 333, at 160 n. 2 (1978) ("[T]he

---

**2.** Invoking the doctrine of judicial estoppel, Park Electrochemical argues that Auld should not be allowed, in supporting this motion, to deny the financial interdependence of Park Electrochemical and Park Nameplate. The Court finds that doctrine inapplicable for several reasons. First, "it is less than clear whether the doctrine has vitality in the Second Circuit." *United States v. Starrett City Associates,* 605 F.Supp. 262, 263 (E.D.N.Y.1985). Second, an essential prerequisite of the doctrine, that the party to be estopped must have been successful in espousing a prior inconsistent position, is not present. Auld failed to convince the Court that the corporate veil between Park Nameplate and Park Electrochemical should be pierced. Auld's second theory, on which it was successful in avoiding summary judgment, is not relevant to this motion. Finally, to apply the doctrine in this circumstance would clash with the doctrine of law of the case. It has previously been determined in this litigation that Park Nameplate's corporate identity should not be disregarded. Park Electrochemical has offered no justification for now reaching a contrary conclusion.

*Perkins* issue was not whether the plaintiff had standing but whether a certain discrimination was within the substantive reach of the statute."). Thus, Park Electrochemical's reliance on *Perkins* in attempting to prove its standing begs the question.

██ Finally, the Court should remark briefly on *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983), another case cited by Park Electrochemical. *Grip-Pak* recognizes that "[a plaintiff] may be able to recover lost profits as a manufacturer even though it has not yet started manufacturing, if it had reasonable prospects of doing so which [the defendant] snuffed out." 694 F.2d at 474–75. Although Park Electrochemical conceded that it never manufactured the allegedly infringing product, and although its brief suggests that its only connection to the relevant market was through its ownership of stock in Park Nameplate, *see, e.g.,* Brief for Park Electrochemical at 11 ("Park [Electrochemical] was eliminated from the emblem business when it sold [Park Nameplate] at book value price ..."), there are also suggestions that it had some notion of entering the market itself and competing with Auld. *See, e.g., id.* at 10 ("Park was prevented from developing its emblem business to a point where it could compete head-on with Auld ..."). Assuming that by these suggestions Park Electrochemical intends to assert the type of claim recognized by *Grip-Pak,* Park Electrochemical fails to meet the rigorous standard mandated by that case. The Seventh Circuit in *Grip-Pak,* adopting the approach of other courts, required that "a company that has not actually entered the market [must] show that it intended to enter and was prepared to do so within a reasonable time, if it wants to collect damages ... for being excluded." 694 F.2d at 475. One court in this circuit,

following *Grip-Pak,* has stated the test in this way:

> Where ... the claim asserted is that the defendant unlawfully prevented the plaintiff from engaging in a business, particularized allegations of preparedness are essential.

*Indium Corp. of America v. Semi-Alloys, Inc.,* 591 F.Supp. 608, 613 (N.D.N.Y.1984). Park Electrochemical's counterclaim is wholly devoid of such allegations.

In sum, the Court concludes that in the circumstances of this litigation, Park Electrochemical lacks standing to assert an antitrust claim against Auld. Accordingly, its third counterclaim must be dismissed.

*The Other Claims*

Park Electrochemical argues that whatever the Court's decision on its antitrust counterclaim, its other claims still survive. Upon inspection, however, the Court finds that these claims, to the extent they have not already been disposed of by stipulation, should also be dismissed.

Park Electrochemical's first counterclaim seeks a declaratory judgment that several patents held by Auld are invalid. Since the parties have stipulated that the only issues remaining in the case involve patent No. 4,100,010, and since that patent has already been invalidated, *see* p. 584 *supra,* the Court finds that nothing remains of this counterclaim.[3]

██ Park Electrochemical's second counterclaim is one for unfair competition based on patent misuse. In the same vein as its antitrust claim, it alleges that Auld obtained its patent through fraud on the patent office and has wrongfully brought this action knowing that its patent was invalid. In support of this claim, Park Electrochemical relies primarily on *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.,* 530 F.2d 508, 515 (3rd Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976). While the strict holding of *Zenith,* that a

---

**3.** In discussing its first counterclaim, Park Electrochemical suggests that it may move for attorneys' fees pursuant to 35 U.S.C.A. § 285. Brief for Park Electrochemical at 4 n. 1. Without expressing any opinion on the merits of such a

motion, the Court finds that Park Electrochemical's right to bring that motion is not linked to the maintenance of this counterclaim and thus should not prevent its dismissal.

plaintiff's attempt "to recover due to [defendant's] alleged fraud, not on it but on the Patent Office itself, does not state a claim on which relief can be afforded," 530 F.2d at 515, is obviously of no use to Park Electrochemical, it presumably intends to rely on the following language from that decision:

> [A]nother legally cognizable claim is for unfair competition based on the inequitable advantage that one party gains from a fraudulently obtained patent which obstructs another party's efforts to develop and market a similar product.

*Id.* Taking this language at its face value, the Court finds that Park Electrochemical's unfair competition claim shares the deficiency of its antitrust claim. Although the considerations may not be precisely the same, *Zenith* suggests, quite logically, that Park Electrochemical may not assert a claim for unfair competition absent some showing that it has been harmed as a competitor. However, as noted previously, *see* p. ——, *supra,* nowhere in its counterclaim does Park Electrochemical allege that it, as opposed to Park Nameplate, had any intention of developing and marketing a product to compete with Auld.[4] Accordingly, this counterclaim should also be dismissed.

*Conclusion*

Auld's motion to dismiss Park Electrochemical's counterclaims is granted in its entirety.[5]

SO ORDERED.

---

[4]. A statement in Park Electrochemical's brief which tracks the language of Zenith, *see id.* at 4 n. 1 ("Auld's patent obstructed the efforts of Park [Electrochemical] and others to develop and market a similar emblem product."), cannot remedy the deficiency of its allegations.

---

[5]. While this action was *sub judice,* the parties briefed and argued an appeal by Park Electrochemical from a discovery ruling by Magistrate John L. Caden. In view of the result on this motion, the Court finds that that dispute is now moot.